**ISAACSON v. CLAUSON, Collector of Internal Revenue.**

**No. 515.**

United States District Court
Maine, S. D.

Jan. 31, 1951.

Irving Isaacson, Lewiston, Me., for plaintiff.

A. Barr Comstock, Special Asst. to the Atty. Gen., for defendant.

CLIFFORD, District Judge.

This is an action to recover income taxes collected from the executor of the estate of Guy L. Smith for the calendar year 1945, in the amount of $917.60, with interest.

The ultimate issue of the case is whether certain long-term capital gains were income "permanently set aside or to be used exclusively" for certain named charitable corporations, the residuary beneficiaries of a trust established by Smith's Will, and were, therefore, deductible in the executor's tax return under section 162(a) of the Internal Revenue Code, 26 U.S.C.A. § 162 (a).[1]

To settle this issue, two questions must be decided. Is the language of the testamentary trust provision of Smith's Will, respecting the power of the trustee to invade the principal of the trust, sufficiently definite to bring the trust within the rule of Ithaca Trust Co. v. United States, 1929, 279 U.S. 151, 49 S.Ct. 291, 73 L.Ed. 647, or sufficiently indefinite to bring it within the rule of Merchants Nat. Bank v. Commissioner, 1943, 320 U.S. 256, 64 S.Ct. 108, 88 L.Ed. 35?[2] If the rule of the Ithaca Trust Co. case applies, do the facts in this case which the Court may properly consider

[1]. Section 162—"The net income of the estate or trust shall be computed in the same manner and on the same basis as in the case of an individual, except that —(a) There shall be allowed as a deduction * * * any part of the gross income, without limitation, which pursuant to the terms of the will or deed creating the trust, is during the taxable year paid or permanently set aside for the purposes and in the manner specified in section 23(o), or is to be used exclusively for * * * charitable * * * purposes, * * *."

[2]. Both the Ithaca Trust Co. and the Merchants Nat. Bank cases involved the issue of deductibility of charitable remainders for purposes of the estate tax, section 812(d) of the Internal Revenue Code, 26 U.S.C.A. § 812(d), being applicable, although the Merchants Nat. Bank case also involved a fiduciary income tax. However, as the Tax Court has noted in Estate of William P. Allen, 6 T.C. 899, the deduction for income tax purposes stands on the same footing as that for estate tax purposes, and the same legal rules govern in both situations.

show that the possibility of such invasion is so remote as to be negligible?

Substantially similar issues are presented in a case now pending in the United States Tax Court, involving a deficiency assessment of estate taxes on the Smith estate, in the amount of $30,333.58.

Guy L. Smith died on January 10, 1944. Plaintiff Peter A. Isaacson was appointed executor of the Will, and also trustee of the trust established by the Will, and is now the duly qualified and acting executor of the Will. The estate of the decedent has not yet been fully probated. The taxpayer is the estate of Guy L. Smith, deceased. In its income tax return for the calendar year 1945, filed with the defendant, Collector of Internal Revenue for the District of Maine, taxpayer showed net capital gains of $10,084.59 from the sale of securities owned by the estate, net taxable income of $4,330.42, and total tax liability of $917.60.

The taxpayer filed claim for refund in the amount of $917.60 on March 6, 1947, and an amended claim on November 12, 1947, basing its claim on the ground that pursuant to the terms of the Will of Guy L. Smith, deceased, capital gains accruing to the benefit of the estate were permanently set aside for the benefit of the Central Maine General Hospital, of Lewiston, Maine, and the Maine Eye & Ear Infirmary, of Portland, Maine, under section 162 (a) of the Internal Revenue Code.

The Central Maine General Hospital and the Maine Eye & Ear Infirmary are corporations which on January 10, 1944, and at all times since that date, came within the class of corporations defined in section 23 (o)(2) of the Internal Revenue Code, 26 U.S.C.A. § 23(o)(2).

On June 21, 1948, the taxpayer instituted this action for refund of the amount stated in its claim for refund. The taxpayer's claims for refund were denied by the Commissioner of Internal Revenue on September 14, 1948.

The Will of Guy L. Smith, deceased, reads, in part, as follows:

"After first deducting all expenses attendant upon the execution of the trust, to hold and deposit the capital and income thereof as follows:

"To hold during a trust term to be measured by the lives of my wife, Mabel B. Smith, if living at the time of my death, and her sister, Ellen Hagman, of Syracuse in the State of New York.

"During the continuance of the trust term the entire net income of said estate is to be paid to my said wife during her natural life, with the sole discretion in my said Trustee to pay over to my said wife from time to time such part of the principal of my estate as may be necessary for the proper support and maintenance of herself.

"In the event that my said wife shall predecease me, or if she is survived by her said sister, Ellen Hagman, the income of said trust estate then in the hands of my said Trustee shall be paid over by my said Trustee to said Ellen Hagman, for and during her natural life.

"When said trust shall have terminated upon the death of my said wife and the said Ellen Hagman, I hereby direct my said Trustee to pay over and distribute the principal of said trust estate then remaining in his hands, in equal parts, to the Central Maine General Hospital, of Lewiston, Maine, and the Maine Eye & Ear Infirmary, of Portland, Maine."

Mr. Smith's gross estate amounted to $551,378.67. Expenses, debts and immediate charitable bequests totalling $108,816.29, and estate taxes of $99,957.97 have been paid. The net principal of the testamentary trust amounts to $342,604.41, subject to a pending estate tax deficiency assessment of $30,333.58, which, as noted earlier, concerns substantially the same legal questions as the case at bar. The $342,604.41 constitutes the corpus of the testamentary trust, the income from which goes to the life beneficiary.

All gains realized by the executor from sales of securities during 1945 were credited to principal and accounted for as increases in principal; and all losses realized from the sale of securities during 1945 were charged to principal and accounted for as decreases in principal. This pro-

cedure is in accord with the Maine rule in such cases. Jordan v. Trust Estate of Jordan, 1913, 111 Me. 124, at page 130, 88 A. 390. The net amount of capital gains to the Smith estate from such sales during the calendar year 1945 was $10,084.59.

Mabel B. Smith, wife of the decedent, was born March 30, 1898, and is still living. At the date of decedent's death, January 10, 1944, she was about 46 years of age and had a life expectancy variously fixed at from 22.97 years to 32.14 years. She was married on January 16, 1946 to Theodore J. Rock, of Auburn, Maine.

When Mr. Smith died, his widow had, in her own name, cash and securities to the value of $13,808.85, and a half interest in real estate, said half interest being conservatively valued at $7,000, or a total of nearly $21,000 in property of her own. Upon Mr. Smith's death, in addition to becoming life beneficiary of the testamentary trust, the principal of which amounted, as noted, to the sum of $342,604.41, she also became life beneficiary of the income of an inter vivos trust established by decedent July 17, 1930. The principal of that trust, placed with the Boston Safe Deposit & Trust Company as successor trustee, amounted on January 10, 1944 to $131,249.-81. Besides directing payment of the income to the widow, the inter vivos trust instrument authorizes the trustee "to make payments from time to time from the principal of said fund to said Mabel Smith if necessary for her support, comfort and welfare if advisable in the judgment of said Trustee, having in mind the income of said Mabel Smith from other sources and the general purposes of this trust."

Mr. Smith also left life insurance in the principal amount of $43,573.97. By the terms of the insurance contract, with the New England Life Insurance Company, the proceeds are held by the company, interest being payable monthly to Mrs. Smith (now Mrs. Rock). She has the right, with the consent of the Boston Safe Deposit & Trust Company, trustee of the inter vivos trust, to withdraw part or all of the life insurance principal for her own use.

Evidence as to certain further facts was offered by the plaintiff, and admitted *de* *bene* after timely objection by counsel for the Government. In June, 1944, or six months after the death of Guy L. Smith, Mrs. Harriet Smith, mother of Guy L. Smith, died testate, leaving her entire estate, consisting of $62,924.03 in cash and securities, to Mrs. Guy L. Smith. On October 28, 1944, or about nine months after the death of Mr. Smith, Mrs. Sigrid Borgeson, mother of Mrs. Guy L. Smith, passed away. Mrs. Guy L. Smith's share of her mother's estate was about $27,000 in real and personal property. As stated, both of these events occurred prior to the year 1945, when the estate of Guy L. Smith received the capital gains with which the present action is concerned. On January 16, 1946, after the capital gains in question had been received and added to the principal of the testamentary trust, Mrs. Guy L. Smith married Mr. Theodore V. Rock, himself a man of substantial means, and the owner of a shoe manufacturing concern.

Counsel for the Government contended that the amount of the charitable remainder must be definitely ascertained as of the date when Mr. Smith died, and that evidence of subsequent events, irrespective of their practical significance, must be disregarded completely by the Court.

There was evidence in the record indicating that on January 10, 1944, the date of the death of Mr. Guy L. Smith, it could have been foreseen that neither Mrs. Borgeson nor Mrs. Harriet Smith had long to live. Both were well advanced in years. Mrs. Borgeson had been suffering from cancer for the eight previous years and had submitted to five operations during that period. Mrs. Harriet Smith had been in ailing health for a year or more before Guy L. Smith died. It might have been assured on that date that the now Mrs. Rock would have received the substantial inheritances from these women which she did receive from their estates; but there is little evidence of such assurance in the record. The death of both of these women did, however, occur prior to the date when the capital gains in question were received. Had the point been pressed before this Court, it might well have been decided that evidence of these events was admissible as

part of the state of facts existing when the capital gains were set aside as part of the principal of the testamentary trust. See Bank of America Nat. Trust & Savings, Ass'n. v. Commissioner, 9 Cir., 1942, 126 F. 2d 48. Of course, the possibility that Mrs. Smith would remarry, or that such remarriage would affect her financial status favorably, was speculative, whether viewed from the date of Mr. Smith's death or from the date when the capital gains were received. However, in view of this Court, it is unnecessary to consider or decide the question of admissibility of evidence of events occurring after Guy L. Smith's death, since this Court rests its decision on basic facts relating to income which were fixed on the date of his death.

In evaluating Mrs. Smith's financial position on January 10, 1944, it will be helpful to summarize and tabulate the income she has received since that date on basic funds which were assuredly hers on that date from the estate of Guy L. Smith only.

|  | Guy L. Smith's Testamentary Trust | Inter Vivos Trust | Life Insurance | Total Income Before Taxes (See Note [3]) |
|---|---|---|---|---|
| 1944 | 11,063.77 | 3,460.35 | 1,310.88 | 15,835.00 |
| 1945 | 8,834.39 | 4,402.13 | 1,310.88 | 14,547.40 |
| 1946 | 7,740.00 | 4,242.54 | 1,310.88 | 13,293.42 |
| 1947 | 8,964.00 | 4,376.27 | 1,310.88 | 14,651.15 |
| 1948 | 9,561.39 | 3,706.73 | 1,310.88 | 14,579.00 |
| 1949 | 11,939.11 | 5,652.20 | 1,310.88 | 18,902.19 |

In addition to an assured income of over $13,000.00 annually, she had her own resources of some $21,000, on which she could draw before there would be any occasion to invade the principal of either trust or of the life insurance.

The plaintiff contends that the capital gain on the sale of estate assets during the year 1945 was income permanently set aside for charitable purposes under section 162(a) of the Internal Revenue Code; that the deduction under section 162(a) is allowable under the authority, and in the words, of the Ithaca Trust Co. case, supra, 279 U.S. at page 154, 49 S.Ct. at page 291, because the value of the gift to the charitable institutions designated is "presently susceptible of reasonably definite ascertainment", and because the standard in the instant case was "fixed in fact and capable of being stated in definite terms of money"; that the income available to the widow at the death of the testator "was more than sufficient to maintain [her] as required"; that in determining whether the capital gains were permanently set aside for charity, "There was no uncertainty appreciably greater than the general uncertainty that attends human affairs"; and finally, that the probability that it will become necessary to invade the principal is so remote that the value of the gift to charity is, as stated, precisely ascertainable.

The defendant contends that the plaintiff has failed to sustain his burden of proof on these issues.

We will consider first the question of law relating to the interpretation of the language of the Will. Counsel have presented to the Court careful and well-reasoned arguments based on cases involving testamentary language similar to that in the Smith Will

3. It is stipulated that, during the same period, the widow received income from all sources, before taxes, as follows:

| 1944 | 16,716.43 |
|---|---|
| 1945 | 15,063.74 |
| 1946 | 16,600.72 |
| 1947 | 17,288.44 |
| 1948 | 18,017.33 |
| 1949 | 23,042.52 |

In the Ithaca Trust Co. case, supra, the Will gave the trustee authority to expend on behalf of the life beneficiary, out of principal, any sum "that may be necessary to suitably maintain her in as much comfort as she now enjoys". The Supreme Court of the United States ruled that the quoted words constituted a standard "fixed in fact and capable of being stated in definite terms of money." 279 U.S. at page 154, 49 S.Ct. at page 291.

In the Merchants Nat. Bank case, supra, the Will authorized invasion of principal in the "sole discretion" of the trustee, "for the comfort, support, maintenance, and/or happiness" of the life tenant, and stated further that "it is my wish and will that * * * my said Trustee shall exercise its discretion with liberality to my said wife, and consider her welfare, comfort and happiness prior to claims of residuary beneficiaries under this trust." 320 U.S. 256, 64 S.Ct. 110. Pointing particularly to the word "happiness", the Supreme Court rules that the Will did not fix any standard for invasion satisfying the requirements of the Ithaca Trust Co. case. Likewise, in Henslee v. Union Planters Nat. Bank & Trust Co., 1949, 335 U.S. 595, 69 S.Ct. 290, 291, 93 L.Ed. 259, the Supreme Court ruled that the words "pleasure, comfort and welfare" did not constitute such a standard.

In the present case the trustee is empowered, in his "sole discretion", to expend such part of the principal for the widow "as may be necessary for the proper support and maintenance of herself." Plaintiff contends that this language satisfies the requirements of the Ithaca Trust Co. case. Defendant asserts that this language more closely approaches that in the Merchants Nat. Bank and Henslee cases, and that those cases should control this Court's decision.

The word "proper" is to be construed as "reasonable", Lincoln Rochester Trust Co. v. Commissioner, 2 Cir., 1950, 181 F.2d 424. If "support and maintenance" is found to be a fixed standard for invasion, the word "proper" will not increase the area of discretion in the trustee to such an extent as to release him from such standard.

But the words "support and maintenance" are held to constitute a definite standard, in the case of Berry v. Kuhl, 7 Cir., 1949, 174 F.2d 565, 568, opinion by Minton, then Circuit Judge. This Court adopts the reasoning of the Court of Appeals in that case, as follows: 174 F.2d at page 568: "We do not accept the Collector's construction that the plaintiff for any reason whatever could obtain funds for her support and maintenance, meaning, as we understand it, that she could raise her standard of living arbitrarily, or perhaps give her property away or waste it, and recoup from the principal of the trust. A more justifiable construction is that the testator intended the plaintiff to enjoy for her life at least the standard of living she enjoyed at the time of his death, and to permit recourse to the trust principal only in the event the return from her own large estate, as well as the income of the trust dwindled until that living standard could no longer be maintained therefrom."

The Court of Appeals for the Second Circuit in Lincoln Rochester Trust Co. v. Commissioner, supra, in finding that the words "proper care, support and maintenance" constituted a definite standard governing the trustee in making payment out of trust principal, cited Berry v. Kuhl with approval.

In the opinion of this Court, the words "proper support and maintenance", used in the Will in the case at bar, do not at all afford the latitude of discretion granted by the words "happiness" and "pleasure", which were found to preclude deduction of charitable remainders in the Merchants Nat. Bank and Henslee cases. Those cases are distinguishable on that ground.

The defendant urges, however, that the rules of Lincoln Rochester Trust Co. and Berry v. Kuhl cannot be applied to a trust governed by Maine law. The estate involved in the Lincoln Rochester Trust Co. case was being administered in New York. In that State, a trustee may not invade principal under the authority of testamentary language like that in issue here, without a prior finding by the Surrogate that the trust income is insufficient to maintain

the beneficiary. Likewise, in Wisconsin, where Berry v. Kuhl arose, the requirement for support and maintenance is reviewable by the State Court.

Defendant asserts that under the Maine rule, on the contrary, the exercise of a trustee's discretion "is not reviewable by the court and his determination is conclusive, provided he acts in good faith."

In effect, defendant argues that the trustee's discretion is so broad under Maine rules that regardless of the standard fixed in the Will, the trustee acting in good faith has practically free rein in invading principal for the benefit of the beneficiary.

In the view of this Court, the cases cited by defendant do not support this extreme position. In re Murray, Me. 1946, 45 A.2d 636, is authority only for the position that the trustee may not abdicate to the beneficiary his discretion in invading principal for the beneficiary's benefit. In Kimball v. Blanchard, 1906, 101 Me. 383, 64 A. 645, 646, the trustee of a small testamentary trust had discretion to invade principal for the "suitable support and maintenance" of the life beneficiary. The trustee made small regular payments to the beneficiary out of principal. The beneficiary brought suit to compel the trustee to pay her whatever sums she should demand for her comfortable support and maintenance. The Maine court held that she was not entitled to that relief, since discretion was vested in the trustee, and "the exercise of *that discretion* by him is not subject to the revision of this court, so long as the trustee has exercised *that discretion* in good faith, according to his best judgment and uninfluenced by improper motives." (Emphasis added.) 101 Me. at page 390, 64 A. at page 648.

The classic statement of the Maine rule with reference to court review of the exercise of a trustee's discretion is given in Alford v. Richardson, 1921, 120 Me. 316, at page 321, 114 A. 193, at page 196, as follows "So long as he acts *within his power,* honestly and in good faith, his determination is conclusive." (Emphasis added.)

In the opinion of this Court this rule is consistent with the statement of the law in 2 Scott on Trusts, section 187:

"To the extent to which the trustee has discretion, the court will not control his exercise of it as long as he does not exceed the limits of the discretion conferred upon him. The court will not substitute its own judgment for his. Even where the trustee has discretion, however, the court will not permit him to abuse the discretion. This ordinarily means that so long as he acts not only in good faith and from proper motives, *but also within the bounds of a reasonable judgment,* the court will not interfere; but the court will interfere when he acts outside the bounds of a reasonable judgment * * *.

"In determining whether the trustee is acting within the bounds of a reasonable judgment, the following circumstances may be relevant: (1) the extent of discretion intended to be conferred upon the trustee by the terms of the trust; (2) the existence or non-existence, the definiteness or indefiniteness, of an external standard by which the reasonableness of the trustee's conduct can be judged * * *.

"* * * The extent of the discretion may be enlarged by the use of qualifying adjectives or phrases such as 'absolute' or 'uncontrolled'. Even the use of such terms, however, does not give him unlimited discretion. *A good deal depends upon whether there is any standard by which the trustee's conduct can be judged.* Thus if he is directed to pay as much of the income and principal as is necessary for the support of a beneficiary, he can be compelled to pay at least the minimum amount which in the opinion of a reasonable man would be necessary * * *." (Emphasis supplied).

By inference from the last quoted statement by Scott, the Court could compel the trustee to restore to the trust any amount paid by him, which was not within the bounds of a reasonable judgment, and which was in excess of what a reasonable man, under all of the circumstances, would consider necessary for the support of the life beneficiary.

Both In re Murray, supra, and Kimball v. Blanchard, supra, as well as Alford v. Richardson, supra, give support to this Court's interpretation that the Maine rule conforms to Scott's statement of the law.

In each of those cases the Maine Court took note of the factual circumstances surrounding the exercise of the trustee's discretion and determined whether or not the expenditures in issue were reasonable under all the circumstances. In re Murray, furthermore, clearly implies that the trustee fails in his duty if he neglects to consider all the resources available to a life beneficiary before invading trust principal for her benefit.

This Court does not understand the rule of the Ithaca Trust Co. case to require that the words of the Will must afford the trustee no discretion whatever in drawing upon principal for the support of a life beneficiary. Rather, this Court interprets the rule of that case to mean that if a standard for invasion is "fixed in fact", in a reasonable sense, and if, applying that standard reasonably, the possibility of invasion is so remote as to be negligible, then a charitable remainder may be deducted.

This Court finds as a matter of law that the Will of Guy L. Smith, by the words "for the proper support and maintenance of Mabel B. Smith", sets a definite standard for the invasion of principal by the trustee.

As bearing upon the practical possibility of invasion of the principal, it may be helpful to give an appraisal of the type and kind of person the beneficiary appears to be. This Court was impressed with her appearance generally, with her honesty, frankness, and intelligence. Prior to her marriage to Mr. Smith, she held a position, for several years, as a high school teacher in Massachusetts. During her eighteen years of married life with Guy L. Smith, she lived in a modest and sensible manner. He was a successful business man, enjoyed a substantial income, and, as has been noted, left an estate valued at over one-half million dollars. She did not then, and has not since, travelled extensively for pleasure, but has accompanied her husband on his business trips. She did not then and has not since had or enjoyed a summer or winter home. She then lived and has continued to live in a modest eight-room frame house in Auburn, Maine, valued at about $15,000. Now, as formerly, she does her own housework, tends her garden, does her own cooking and marketing, employs no outside help except a cleaning woman once a week and a boy to mow the lawn. She retained, until 1949, two automobiles purchased by Mr. Smith in 1941. She then exchanged them for more modern automobiles, her present husband, Mr. Rock, paying the difference in price. She has retained intact the money and securities she received over five years ago from the estates of her mother and mother-in-law. She has saved substantial sums of money from her income each year since the death of Mr. Smith. She has invested part in securities and has placed the remainder in savings accounts in various banks. Since her second marriage she has taken care of about the same routine living expenses that were hers after Mr. Smith's death when she lived alone. These amount to between $6,000 and $7,000 per year. Considering her income from the testamentary trust, the inter vivos trust, and the insurance, which has totalled never less than $13,293.42 and as high as $18,902.19, her scale of living has been modest. It is agreed that her total income, from all sources, has varied between $15,063.74 and $23,042.52 since 1944.

In the opinion of this Court she is a very good business woman, a good housekeeper, well-balanced, even-tempered, in good health, living in a modest and sensible manner, and well within her financial means. In short, she is typical of the careful and thrifty New England housewife.

This Court is not impressed by speculations indulged by counsel concerning the possibilities, in 1945, that this country would suffer from a wild inflation or deep depression, causing major fluctuation in the income or living expenses of the life beneficiary. Evidence was admitted by agreement showing the increasing cost of living since 1944, and also the increasing rate of corporate earnings and dividends in the same period. It is significant in this regard that the rate of corporate dividends has increased more rapidly in this period than has the cost of living.

It further appears to this Court that there is an adequate margin of income,

490

without taking into consideration Mrs. Rock's own personal resources, to meet any medical expenses Mrs. Rock might be obliged to incur in the future.

█ In the opinion of this Court, the facts in this case clearly show that the possibility of an invasion of the principal of the testamentary trust is so remote as to be negligible.

Therefore, this Court rules that the capital gains from the sale of securities in the testamentary trust, which became part of the principal of the trust by the operation of the Maine law, were permanently set aside for charities, within the meaning of section 162(a) of the Internal Revenue Code, and were deductible from the gross income of the estate for the purposes of the Federal Income Tax. The plaintiff is entitled to recover the amount of the tax collected on these capital gains, with interest as provided by law.

An order may be submitted in conformity with this opinion.